UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

| | | |
|---|---|---|
| TOMMY D. GARREN, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 3:17-cv-149 |
| | ) | |
| v. | ) | Judge Collier |
| | ) | |
| CVS RX SERVICES, INC., *et al.*, | ) | Magistrate Judge Poplin |
| | ) | |
| *Defendants*. | ) | |

**M E M O R A N D U M**

Before the Court is a motion for summary judgment filed by Defendants, CVS Rx Services, Inc., CVS Pharmacy, Inc., and Tennessee CVS Pharmacy, LLC, on the claims of Plaintiff, Tommy D. Garren, in this employment discrimination case. (Doc. 80.) Plaintiff responded in opposition (Doc. 84), and Defendant replied (Doc. 85). Also before the Court is Plaintiff's objection to two of the exhibits to Defendant's reply brief. (Doc. 88.) Defendant has responded in opposition. (Doc. 89.)

The Court will **OVERRULE** Plaintiff's objection (Doc. 88) **AS MOOT**. The Court will **GRANT** Defendants' motion for summary judgment (Doc. 80) **IN PART** as to all of Plaintiff's claims against CVS Pharmacy, Inc., and Tennessee CVS Pharmacy, LLC, and **GRANT IN PART AND DENY IN PART** the motion as to Plaintiff's claims against CVS Rx Services, Inc.

I.     **BACKGROUND**

At the beginning of 2015, CVS Rx Services, Inc. ("CVS") employed Plaintiff as one of two staff pharmacists at CVS store number 7685, in Tellico Plains, Tennessee ("Tellico"). Plaintiff had worked for CVS as a pharmacist for decades, receiving positive reviews, no documentation of performance issues, and no customer complaints. He was approximately sixty-two years old.

The other staff pharmacist at the Tellico store, Bryan Wooldridge, was approximately fifty-three years old. Wooldridge was the Tellico pharmacy manager and Plaintiff's direct supervisor.[1] Wooldridge's supervisor was Pharmacy Manager Linda Mitchell, age fifty-nine. Mitchell in turn reported to District Manager Jeffrey Broyles, age forty-four. Broyles also supervised Shawn Plemons, age forty-four, who managed the store in which the Tellico pharmacy was located.

During Plaintiff's annual review in 2013 or 2014, Broyles asked Plaintiff when he planned to retire.[2] Plaintiff said he had not thought about retiring, but he intended to work as long as he could and consider retirement when he was old enough. During Plaintiff's next, and final, annual review, Mitchell asked Plaintiff the same question. Again, Plaintiff said he intended to work as long as he was able.

A. **Plaintiff's Chronic Venous Insufficiency**

Plaintiff has chronic venous insufficiency, which causes swelling in his legs and limits how long he can stand. In 2010, Plaintiff asked Wooldridge if Wooldridge would mind taking more hours so Plaintiff could move from a forty-hour-week to a thirty-hour week because of Plaintiff's leg swelling. Wooldridge, who was not yet Plaintiff's supervisor, agreed. Also in 2010, Plaintiff told Mitchell he was having trouble with his ankles and showed his swollen ankles to Mitchell.

In May or June 2015, Mitchell told Plaintiff he needed to go back to a forty-hour schedule. On June 7, 2015, Plaintiff's base hours were increased to thirty-nine hours.

---

[1] Plaintiff began working at the Tellico store in 2004. From then until 2014, Wooldridge's title was pharmacist-in-charge, and both he and Plaintiff reported to a pharmacy manager.

[2] Plaintiff testified that this took place during his second-to-last annual review. Plaintiff was terminated in November 2015. The Court infers that his second-to-last annual review took place in 2013 or 2014.

2

### B. Plaintiff's Transfer to a Floater Pharmacist Position

In October 2014, Angela Lane (later Angela Householder) received an offer from CVS for a pharmacist position after her expected graduation from pharmacy school in May 2015. Lane had been an intern in the Tellico pharmacy and was a friend of Plemons's. In or before May 2015, Mitchell and Broyles discussed placing Lane in Plaintiff's position as a staff pharmacist at Tellico, changing Plaintiff to a floater pharmacist who moved from store to store as needed. On May 21, 2015, Mitchell sent an email to Broyles stating "Angela [Lane] has her dates set . . . June 1st MJPE and Naplex on June 5th. I am not sure I really need to change Tommy's hours since this was not going to be done until June 7th. Any ideas on how to handle Tommy??" (Doc. 83-2 at 211 [Pl.'s Ex. 11].) Lane was approximately twenty-seven years old in 2015.

Two months later, on July 28, 2015, Broyles phoned Plaintiff at work and told him he would be made a floater pharmacist effective the next week. Plaintiff asked Broyles for a meeting. Broyles and Mitchell met with Plaintiff the next day.

Plaintiff secretly recorded his July 29, 2015, meeting with Broyles and Mitchell. During the meeting, Broyles and Mitchell told Plaintiff CVS had a policy that new pharmacy graduates could not be floater pharmacists. They also said they wanted to place Lane at Tellico because it would be a good first store for her. Plaintiff questioned the wisdom of removing him from Tellico and replacing him with an inexperienced graduate.[3] He also expressed dissatisfaction with matters at Tellico, particularly with Plemons as store manager, and said he was not entirely against floating for that reason. Plaintiff said he would like to float and asked what his schedule would be like. He also asked several times what would happen if he refused to become a floater. Mitchell answered that he appreciated that Plaintiff was not refusing, because Mitchell needed Plaintiff to

---

[3] Specific quotations from the meeting are included below in Section III(C)(2).

become a floater.  When Plaintiff asked directly whether he would be fired if he refused, Mitchell said no, adding again that he needed Plaintiff to float.

On July 30, 2015, Plaintiff received his first schedule as a floater, to begin August 2, 2015. Plaintiff did not like his schedule and believed it was being manipulated to make him want to quit or retire.  Plaintiff was also displeased that he was not paid for his time driving, even though CVS typically paid floaters for driving time.  On August 5, 2015, Plaintiff complained to Broyles's supervisor, Regional Manager David Sanford, of age discrimination.  Sanford forwarded the complaint to Regional Human Resources Business Partner Randall (Randy) Hatfield, with a request that Hatfield contact Plaintiff "and let him know you will look into this."  (Doc. 80-3 at 37.)  Hatfield admitted during his deposition that he had no documents reflecting an investigation of Plaintiff's claims of age discrimination, other than emails with Plaintiff and a summary sent to Sanford of Hatfield's phone conversation with Plaintiff.  Broyles, Mitchell, Plemons, Wooldridge, and other CVS employees testified in their depositions that they had not heard about Plaintiff's age discrimination complaints or any investigation of such complaints.

Hatfield spoke with Plaintiff about Plaintiff's complaint by phone on August 14, 2015.[4] Hatfield asked Plaintiff if he wanted to go back to Tellico with his previous hours, and Plaintiff said he did not.  On August 18, 2015, however, after receiving another floater schedule he did not like, Plaintiff emailed Hatfield and asked to be placed back at Tellico with his previous hours, along with compensation for his driving time as a floater.

On September 13, 2015, after six weeks of working as a floater, Plaintiff was transferred back to his former position as a staff pharmacist at Tellico.  Lane was moved elsewhere.

---

[4] Plaintiff secretly recorded this conversation, as well.

## C. Plaintiff's Suspension and Level III Warning

A little over a week after Plaintiff was transferred back to Tellico, on September 22, 2015, Store Manager Plemons emailed Mitchell and Broyles about Plaintiff. She said she had worked at Tellico only one day since Plaintiff's return, and Plaintiff had not been in the store that day. However, she complained about statements she had been told Plaintiff had made about her, CVS, and upper management since his return. She criticized Plaintiff's effect on morale and customer service. She asked that human resources "come and interview each of the employees at my store," stating "I feel this is a hostile workplace due to his comments towards me." (Doc. 80-11 at 15.) She specified that she was not complaining about the job Plaintiff was doing as a pharmacist. (*Id.*)

Hatfield visited Tellico and spoke with three employees in what CVS describes as a morale survey. The employees said Plaintiff had made Plemons cry, did personal business on work time, showed inappropriate pictures to staff, and acted disrespectfully. One employee also reported hearing Plaintiff say he felt Plemons and Lane were trying to get rid of him, that he was hiring an attorney, and that he resented that a new pharmacy graduate had been hired to replace him.

Responses to the morale survey also complained about Plaintiff's not making pharmacy phone calls. CVS required pharmacy staff to make what were known as New Script Pickup calls and Prescriber Follow-up calls. New Script Pickup calls were reminders to customers to pick up prescriptions after customers failed to respond to multiple automated notices that their prescriptions were ready. Prescriber Follow-up calls were requests to prescribers regarding prescriptions that were out of refills. CVS had an automated queue listing such phone calls to be made, and items in the queue would turn red if not addressed by a certain time. Responses to the morale survey mentioned Plaintiff's not making these phone calls, his saying the calls were unethical, and his saying he did not care about being "in the red." Plaintiff testified in his deposition that he objected to making Prescriber Follow-up calls only where the prescriber

5

originally wrote a prescription to have no refills and the customer had not requested a refill, on the grounds that filling such a prescription would automatically create a bill to the customer's insurance company without the customer's knowledge.

Hatfield did not speak with Wooldridge, who was Plaintiff's supervisor and the pharmacy manager, as part of the morale survey. Nor did Hatfield speak with Wooldridge about the comments touching on pharmacy operations. Wooldridge was unaware of the morale survey at the time. Hatfield also did not send Plemons a response to her complaint.

On October 2, 2015, Hatfield sent an email to Broyles and Mitchell discussing the statements he had obtained from the three Tellico employees and asking to discuss "next steps" regarding Plaintiff. (Doc. 83-2 at 199 [Pl.'s Ex. 8].) He suggested a meeting when Plaintiff did not expect them to come. He said they "should have detailed reports showing a drop in Rx performance upon his return," with a bullet point saying: "Do a before and after to paint the picture." (*Id.*) Plemons was asked to prepare these reports, which she conceded were for the purpose of showing Plaintiff was not doing a good job as a pharmacist. (Doc. 83-7 at 13–14, 19 [Plemons Dep. at 260–51, 355–56].)

On October 19, 2015, Hatfield and Broyles met with Plaintiff to tell him he was being suspended pending an investigation. Plaintiff was not paid for his suspension at the time of the suspension.[5] On October 19 and 20, Plaintiff sent multiple short emails to Hatfield, including complaints against Plemons and Broyles for various types of alleged work-related misconduct and

---

[5] An October 27, 2015, email from Mitchell to Broyles forwards an "e-ticket" regarding Plaintiff's pay during the suspension. (Doc. 83-4 at 107 [Pl. Ex. 46].) The e-ticket request says Plaintiff "was suspended from work on Monday, Oct 19th . . . and . . . should not be paid HUB for the week of 10/18–10/24 . . . he should be paid 3 reg hrs for this week only. (*Id.* (last ellipsis in original).) The subject line of the email states in full: "Tommy's pay . . . We can make sure that he wasn't paid . . . but from what this says they did only pay him 3 hours??? Now what [illegible] I do?? I sent e-ticket prior to Randy deciding not too [sic] . . . ." (*Id.* (ellipses in original).)

a complaint that Plaintiff was being retaliated against. [Doc. 83-2 at 220–31 [Pl. Ex. 17].) One of Plaintiff's emails asked if Plemons and Broyles would be suspended pending an investigation, since Plaintiff was making formal complaints against them. (*Id.*) Hatfield asked Broyles to get information on some of Plaintiff's complaints. Hatfield did not, however, discuss Plaintiff's allegations with Plemons as the store manager or Wooldridge as the pharmacy manager.

On October 21, 2015, Hatfield exchanged emails with Employee Relations Manager Bernie Smith reporting on the meeting two days earlier and discussing next steps, including the possibility of termination:

> In summary, the conversation with Tommy was as expected. He became very defensive in the end and he started sending mulitiple [sic] emails with claims that we've been unable to substantiate at this time. I do feel he damages our brand, does not help people on a path to better health, and will not be able to adapt or change to CVS processes.
>
> - We can move to a termination, or
> - We can move to another location but his behaviors will not change in another location – he is very open that he will use professional judgment, meaning that he knows when to make a doctor call, etc.

(Doc. 83-2 at 139–143 [Pl. Ex. 1 at Bates No. 1006–10]; *id.* at 39 [Hatfield Dep. 246–47].)

Plaintiff was allowed to return to work eight days later, on October 27, 2015. On that day, Broyles and Wooldridge issued Plaintiff a Level III final warning and an Improvement Action Plan. The Level III warning bypassed earlier stages in CVS's progressive discipline policy. Broyles had Wooldridge type the previously prepared writeup into CVS's computer system, even though Woodridge had not participated in developing its content.

On October 28, 2015, Plaintiff complained again to Hatfield by email, saying he believed the suspension and warning were part of a setup to terminate him.

7

### D.    Plaintiff's Termination

In 2015, CVS customer receipts included a phone number for customers to call and complete a survey on store and pharmacy services.

Plaintiff testified that it had been a long-time practice at Tellico for Plemons and Broyles to encourage employees to call in customers' surveys to give the store good marks. Plaintiff submitted a declaration from a former Tellico pharmacy employee, JoAnn Hamrick, stating that once a month, Plemons and a shift supervisor would make "bogus survey calls using discarded sales receipts in order to manipulate the store's metric scores." (Doc. 83-12 at 3–4 [Hamrick Decl. ¶ 10].) Hamrick testified that Plemons and the supervisor would ask to borrow Hamrick's cell phone to make the calls.

Plaintiff testified that after his transfer back to Tellico from floating, he noticed that survey marks on the pharmacy were going down. He believed Plemons was manipulating surveys to make the pharmacy look bad. Accordingly, he deliberately kept two receipts customers did not want and, in view of the security cameras, called in survey results on those two receipts. On both surveys, he gave the pharmacy the highest marks and the front store the lowest marks. Plaintiff testified that he did this to try to trigger an investigation into employee completion of the surveys.

In late October 2015, Plemons reviewed the Tellico survey results and noticed the two negative scores for the front store. She reviewed store surveillance footage and saw that Plaintiff had kept one, and probably both, receipts. On October 30, 2015, she sent a fax regarding the surveys and video footage to Steve Burd, the Regional Loss Prevention Manager. Burd conducted an additional investigation.

On November 5, 2015, Broyles told Plaintiff he wanted to meet with him again. Plaintiff emailed Hatfield that afternoon, saying:

Jeff called me about meeting tomorrow to follow up on the write up and action plan. I have not heard from you about my AGE complaint that I filed in August nor the following complaint I sent you last week. Did you discuss with Jeff my complaints? I am not going to be forced to quit or retire and I can tell Jeff is trying to fire me after 31 years for made up reasons. I need you to stop the harassment. Please let me hear from you before the meeting.

(Doc. 83-11 at 40 [Pl. Ex. 119] (emphasis in original).)

On November 6, 2015, Burd and Broyles met with Plaintiff regarding the surveys. Plaintiff admitted he had called in the two surveys, said he had done it to trigger an investigation into how he was being sabotaged, said the practice was widespread, and asked Burd to investigate Broyles and others regarding the handling of surveys. Plaintiff also claimed he was being discriminated against based on his age. Later that day, Broyles fired Plaintiff. Broyles, Mitchell, Hartfield, and Sanford had all participated in the decision.

CVS replaced Plaintiff with floater pharmacists and with two new pharmacy graduates in turn. The current incumbent in the position is twenty-seven years old.

### E.     Litigation

Plaintiff filed suit against Defendants[6] on April 20, 2017, asserting causes of action under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.*, (the "ADEA"), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*, (the "ADA"). (Doc. 1 at 13–18.) On January 22, 2019, the Court held a jury trial on the sole question of whether Plaintiff and Defendants had entered into an agreement to arbitrate their dispute. (Docs. 52, 54.) The jury ruled for Plaintiff, finding there was no such agreement. (Doc. 55.) Defendants now move for summary judgment on all of Plaintiff's claims against them. (Doc. 80.)

---

[6] The initial complaint named CVS Health Corporation, Inc. as a defendant. (Doc. 1.) The amended complaint substituted CVS Rx Services, Inc. (Doc. 8.)

## II.     STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

To survive a motion for summary judgment, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations." *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *2–3 (E.D. Tenn. Nov. 4, 2009) (explaining the court must determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff"). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). The Court may not make credibility determinations or weigh the evidence in addressing a motion for summary judgment. *Id.* at 255.

10

If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should grant summary judgment. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. <u>DISCUSSION</u>

The Court will first consider Plaintiff's objection to two of Defendants' exhibits. The Court will then address Defendants' attacks on Plaintiff's various claims in turn.

### A. Objection to Exhibits

Plaintiff objects to two exhibits (Docs. 85-3, 85-4) attached to Defendants' reply in support of the motion for summary judgment. (Doc. 88.) Plaintiff argues these exhibits are based on the testimony of Cory Long, whom Defendants did not identify in their disclosures under Rule 26 of the Federal Rules of Civil Procedure. Defendants respond that they timely disclosed all of the data and documents included in the two exhibits, and Mr. Long qualifies as the "representative and/or keeper of records" referred to in Defendants' second supplemental initial disclosures. (Doc. 89.)

The disputed exhibits consist of reports of various metrics for Plaintiff, Wooldridge, and Lane. Consideration of these metrics would have no effect on the Court's resolution of Defendants' motion for summary judgment. Accordingly, the Court will **OVERRULE** Plaintiff's objection (Doc. 88) as moot.[7]

### B. Claims Against CVS Pharmacy, Inc. and Tennessee CVS Pharmacy, LLC

Defendants move for summary judgment on all claims against CVS Pharmacy, Inc. and Tennessee CVS Pharmacy, LLC, arguing neither entity employed Plaintiff. (Doc. 81 at 1 n.1.)

---

[7] Plaintiff's objection extends to the use of the disputed exhibits at trial. "A request for a court order must be made by motion." Fed. R. Civ. P. 7(b)(1). The Court will therefore not consider Plaintiff's request for a determination on the use of disputed exhibits at trial at this time.

11

Plaintiff's responds that these two entities were his "joint employers" with CVS Rx Services, but he provides no evidence to support this assertion. (Doc. 84 at 1.) Because Plaintiff has failed to provide evidence to support an essential element of his case against CVS Pharmacy, Inc. and Tennessee CVS Pharmacy, LLC, these two Defendants are entitled to judgment on Plaintiff's claims against them. *See Street*, 886 F.2d at 1479 (movant may meet burden of demonstrating no genuine issue of material fact exists by pointing out non-movant's failure to provide evidence to support an essential element of case). The Court will **GRANT** summary judgment in favor of CVS Pharmacy, Inc. and Tennessee CVS Pharmacy, LLC on all claims.

### C.     ADEA Discrimination

Where a plaintiff bases an ADEA claim on circumstantial evidence, a court considering a motion for summary judgment follows the familiar burden-shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory explanation for its actions. *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003) (citing *Burdine*, 450 U.S. at 253). If the employer articulates an appropriate explanation, the burden shifts back to the plaintiff to demonstrate the employer's explanation is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802–04, 807. Pretext can be proven by showing the reason the employer gave for its actions "had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct." *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012) (quoting *Schoonmaker v. Spartan Graphics Leasing, LLC¸* 595 F.3d 261, 268 (6th Cir. 2010)). A defendant bears only the burden

of production and not the burden of persuasion. *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003).

Throughout this burden shifting, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253); *see also DiCarlo v. Potter*, 358 F.3d 408, 414–415 (6th Cir. 2004). The plaintiff cannot rely purely on "mere personal belief, conjecture and speculation" because they are insufficient to support an inference of discrimination. *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (internal alteration omitted).

The Court must apply the *McDonnell Douglas* burden-shifting framework to each action Defendant alleges was discriminatory: his transfer to a floater position, the suspension and Level III warning he received, and his termination. First, however, the Court must identify the elements of a prima facie case of discrimination under the ADEA.

### 1.    Elements of Prima Facie Case

The parties agree on three of the four elements of a prima facie case of discrimination under the ADEA: (1) the plaintiff must be at least forty years old; (2) the plaintiff was qualified for the job in question; and (3) the plaintiff suffered an adverse employment action. (*See* Doc. 81 at 12, Doc. 84 at 15–16.)

They disagree on the fourth element. Defendant characterizes the fourth element as requiring a plaintiff to show "he was either replaced by a younger worker or treated differently than similarly situated individuals." (Doc. 81 at 12 (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008)).) Without commenting on Defendant's rendering of the prima facie case, Plaintiff presents as the fourth element "circumstances that support an inference of discrimination." (Doc. 84 at 16 (quoting *Camp v. BI-LO, LLC*, 662 F. App'x 357, 365 (6th Cir.

13

2016)).)  Defendant's reply, in turn, does not address the discrepancy between its characterization of the elements and Plaintiff's, other than to say Plaintiff has failed to respond to its specific arguments on a lack of evidence CVS treated similarly situated individuals differently than it treated Plaintiff.

The United States Court of Appeals for the Sixth Circuit recently addressed the fourth element in a prima facie case of age discrimination under the ADEA.  *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020).  The fourth element is the existence of "circumstances that support an inference of discrimination."  *Id*. at 808 (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012)).  "[S]uch circumstances **include** when the employer replaced the plaintiff with a younger employee and when the employer 'treated similarly situated, non-protected employees more favorably.'"  *Id*. (emphasis added) (quoting *Mickey*, 516 F.3d at 521–22); *see also Blizzard*, 698 F.3d at 283 (fourth element is "circumstances that support an inference of discrimination," and "[a]n allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the difference in age is significant") (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510 (2002)).

Having identified the elements of a prima facie case, the Court will consider in turn each of the three allegedly discriminatory actions of which Plaintiff complains.

### 2.    Transfer to Floater Position

Plaintiff claims his transfer to a floater position constituted age discrimination under the ADEA.  CVS's motion for summary judgment attacks the adverse-employment-action element of Plaintiff's prima facie case regarding the transfer, then argues in the alternative that it had a legitimate, non-discriminatory reason for the transfer as to which Plaintiff cannot demonstrate pretext.

14

### a. Whether Plaintiff Consented to the Transfer

First, CVS argues Plaintiff's transfer to a floater position was not an adverse employment action because Plaintiff consented to it. (Doc. 81 at 12–13.) Plaintiff responds that he did not consent to the transfer, but only "reluctantly acceded" to it. (Doc. 84 at 16; *see also id.* at 4–5.) Plaintiff also argues he could not have consented to the transfer because CVS made the decision to transfer him two months before informing him of it. (*Id.* at 16.) Neither party cites any legal authority regarding the significance of consent in establishing the existence of an adverse employment action.

CVS argues Plaintiff's own statements during his recorded meeting with Broyles and Mitchell on July 29, 2015, show he consented to become a floater pharmacist. (Doc. 81 at 13 (citing Doc. 80-10); *see also id.* at 4–5 (quoting Doc. 80-10).) The statements CVS cites appear in bold type below, with context in regular type:

- "And there is a lot of things you all don't know. But that's why I cannot understand why you would want to put a new girl, inexperienced, in a pressure place like that. . . . You're making a bad move, but don't get me – let me tell you something else. I am not crazy about working at Tellico. It ain't – I am not – they only – **I didn't come up here to tell you that I don't want to get out of there and I don't want to float. I'm not here to tell you that, because that is not the best place to work.**" (Doc. 80-10 at 27–28 [July 2015 Tr. at 17:11–18:5].)

- "You are going to have problems, but that is your prerogative. That store has got good numbers in the pharmacy. We have been doing great. We have been making plenty of money, and if you want to risk it, that is your prerogative. I have seen the same plan play out in some of these other stores. It has went (sic) to pot, that was doing great . . . . And you are going to add this one to the list, but as far as, **I don't want you all to think that I think so much of the store, that I just want to stay, and I am up against this floating deal**, you know, because I am not. Because you are going to – you are fixing to put that young lady into something, but she will be in there with a friend. And you know, that makes a difference to some people." (*Id.* at 44–45 [July 2015 Tr. at 34:10–35:3] (error notation in original).)

15

- "I just want to share a few things with you, and I am not the bad guy that you all have been lead [sic] to think that I am. Me, not being a team player, a lot of times when you give the team constructive criticism and they don't want it – you don't know why I've been labeled, not a team player, but you know, **I just want to stop and share a few things with you and I'd like to be floating. I would like to know more about a schedule; you know what I'm saying?**" (*Id.* at 46–47 [July 2015 Tr. at 36:22–37:8].)

- *Plaintiff:* "[W]ell, let me ask you this. Just – and just this is just a theoretical question. What would happen if I didn't want to float?" *Broyles:* "Like I say, I would have to ask you to float, and I appreciate you not saying that." *Plaintiff:* "Yes, but what if I said no, I don't want to float? I have been with this company 31 years and I'm happy where I'm at. My customers are happy. I don't feel like I need to float." (*Id.* at 51–52 [July 2015 Tr. at 41:21–42:7].)

- **"But now, don't get me wrong, I am not totally against floating. . . . I am about ready to get out of that place, up there."** (*Id.* at 58 [July 2015 Tr. at 48:8–12].)

- *Plaintiff:* "[B]ut back to my question, again. If I told you, no, I am not interested in floating; I just want to stay right there in Tellico; what would –" *Broyles:* "Like I said, I'm appreciative that you didn't, because –" *Plaintiff:* "Well, I understand that. What would you say?" *Broyles:* "That I need you to float." ***Plaintiff:* "Would you say, you are fired?"** *Broyles:* **"No, I need you to float.** You've got value. And I don't want to discount that." (*Id.* at 61–62 [July 2015 Tr. at 51:23–52:13].)

The language on which CVS relies is not from a contract that must be interpreted. It is from a conversation between an employee and representatives of his employer, consisting of statements, questions, and answers which sometimes pull in various directions. Even the short portions CVS cites could be interpreted either as consent to the transfer or as an attempt by Plaintiff to appear cooperative in a difficult situation at work and to communicate about problems in his then-current placement. The context in which Plaintiff's statements were made add to the ambiguity, including Plaintiff's references to the transfer being CVS's "move" and "prerogative," and Broyles's repeated deflection of Plaintiff's questions about what would happen if he said "no" into a discussion of how important it was that he not say no. In all, there is a genuine issue of fact

16

as to whether Plaintiff consented to becoming a floater pharmacist or merely acquiesced in CVS's decision. CVS is not entitled to summary judgment on the grounds of consent.

### b. Whether the Transfer Constituted an Adverse Employment Action as a Matter of Law

Second, CVS argues Plaintiff's transfer from staff pharmacist to floater pharmacist does not qualify as an adverse employment action because it did not involve a "significant change in responsibilities, a loss in pay or benefits[,] or any other negative change in his employment status." (Doc. 81 at 13.) In response, Plaintiff identifies various ways in which he believes the transfer qualified as an adverse employment action, in that Plaintiff:

> (1) could not obtain enough work hours; (2) had to travel literally hundreds of miles to work just a few hours; (3) had his vacation time unilaterally usurped; (4) was not paid for travel time or mileage; and (5) was scheduled for twelve hours [sic] shifts along with late night shifts, all a stark contrast from his job at Tellico. Moreover, [(6)] Plaintiff's title was changed and . . . [(7)] a current CVS manager . . . testified that the transfer was . . . a demotion.

(Doc. 84 at 16; *id.* at 5 (citations omitted).) In its reply, CVS offers evidence contesting some of Plaintiff's factual claims. (Doc. 85 at 7–9 (citations omitted).)

An employment action is adverse if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)). A reassignment or a transfer to a different position can be an adverse employment action, even without a change in salary, where it is paired with a change in work hours, "a less distinguished title, a material loss of benefits, . . . or other indices that might be unique to a particular situation." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)). In addition, "[a]n 'inconvenience resulting from a less favorable schedule can render an employment action

17

"adverse" even if the employee's responsibilities and wages are left unchanged.'" *Id.* at 392 (quoting *Ginger v. Dist. of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008)).

There is a genuine issue of fact as to whether Plaintiff's transfer from staff pharmacist to floater pharmacist was an adverse employment action. On the one hand, his salary and benefits stayed the same, the positions required the same skill and professional credentials, and the positions had similar responsibilities. On the other hand, a current CVS manager testified during her deposition (and then allegedly retracted after a break) that a transfer to a floater position would have been upsetting to Plaintiff because it was a demotion. (Doc. 83-5 at 5 [Dotson Dep. 69:4–18].) Plaintiff's title changed, which may play into the analysis. Finally, the parties have presented conflicting evidence as to whether the transfer had a negative effect on Plaintiff's work hours and schedule, his travel time and mileage, and his use of vacation time. (*Compare* Doc. 84 at 5 and materials cited therein *with* Doc. 85 at 7–9 and materials cited therein.)[8] Because there is a genuine issue of fact as to whether Plaintiff's transfer to a floater position was an adverse employment action, CVS is not entitled to summary judgment on the grounds that Plaintiff has failed to state a prima facie case of discrimination.

### c. Whether the Floater Policy Was a Pretext for Discrimination

Third, CVS argues that even if Plaintiff makes out a prima facie case of discrimination as to his transfer to a floater position, CVS had a non-pretextual reason to make the transfer anyway: its policy of not allowing newly hired graduates from pharmacy school to work as floater pharmacists. (Doc. 81 at 14.)

---

[8] Some of Plaintiff's evidence consists of his own testimony and some of CVS's evidence consists of documents. At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party and may not make credibility determinations or weigh the evidence. *Anderson*, 477 U.S. at 249, 255. The Court is therefore not able to decide which side's position deserves credence in these factual disputes.

If an employer articulates an appropriate explanation for an action as to which the plaintiff has made out a prima facie case of discrimination, the plaintiff must demonstrate the employer's explanation is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802–04, 807. Pretext can be proven by showing the reason the employer gave for its actions "had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct." *Lefevers*, 667 F.3d at 725.

Plaintiff argues CVS's assertions about a policy restricting floaters to experienced pharmacists is a pretext for discriminating against Plaintiff because of his age. (Doc. 84 at 17.) He asserts none of CVS's witnesses could identify any writing substantiating such a policy, and he points to evidence that various new pharmacy graduates in fact "worked shifts in other CVS stores as needed, or desired, just as floaters do." (*Id.*; *see also id.* at 4 (citing Doc. 83-10 at 5 [Gibson Dep. at 110:7–18] ("[Lane] picked up the four hours that morning at that store. Even if they're not a floater, if they're a staff pharmacist, they can pick up a shift if I've got all the floaters scheduled.") Plaintiff thus invokes the first method of demonstrating pretext, that a presented reason for an allegedly discriminatory action "had no basis in fact." *See Lefevers*, 667 F.3d at 725. CVS's reply does not respond to Plaintiff's arguments on pretext.

Combining this evidence with the apparently unwritten nature of CVS's floater policy and the fact that new pharmacists could work in various stores in the same manner as floaters, a fair-minded jury could return a verdict in favor of Plaintiff on this record. Summary judgment for CVS on Plaintiff's discrimination claim based on his transfer to the floater position is therefore inappropriate. *See Anderson*, 477 U.S. at 251–52.

Because Plaintiff has established a prima facie case of ADEA discrimination as to Plaintiff's transfer to a floater pharmacist position, and because Plaintiff has adequately met his

19

burden of showing CVS's explanation for the transfer was a pretext for discrimination, the Court will **DENY** CVS's motion for summary judgment on this claim.

### 3.   Suspension and Warning

Plaintiff claims his suspension and subsequent Level III warning were factually inseparable from each other and constituted age discrimination under the ADEA.  (Doc. 84 at 18.)

CVS first attacks the adverse-employment-action element of Plaintiff's prima facie case on this claim because neither warnings nor paid suspensions normally constitute adverse employment actions.  (Doc. 81 at 14–15.)  Plaintiff responds that the suspension was unpaid at least at the time, and therefore constitutes an adverse employment action even if CVS paid him for the time later.  (Doc. 84 at 18–19.)

"[A] suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action."  *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (emphasis in original) (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 803 (6th Cir. 2004)).  Conversely, a suspension without pay may constitute an adverse employment action, even where back pay is later granted.  *White*, 388 F.3d at 800–02.  This is so in part because an employee's loss of the use of his or her wages even for a time can be a harm, and because it may require more than simple back pay to make a plaintiff whole from the injuries caused by an unlawful act of employment discrimination.  *See id.* at 802 (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223–24 (2d Cir. 2001)).

Plaintiff has presented evidence that his October 19, 2015, suspension was unpaid at the time it occurred.  (Doc. 83-2 at 35 [Hatfield Dep. at 228]; Doc. 83-2 at 232 [Pl.'s Ex. 18].)  Specifically, for the pay period ending October 10, 2015, Plaintiff's gross pay was $3,887.49 and his net pay was $2,676.88.  (Doc. 83-2 at 232 [Pl.'s Ex. 18].)  For the pay period ending October 24, 2015, Plaintiff's gross pay was $194.37 and his net pay was $1.12.  (*Id.*)  Plaintiff has also

presented evidence that not paying him for his suspension was a deliberate, and therefore potentially punitive, choice by CVS. (*See* Doc. 83-4 at 107 [Pl.'s Ex. 46] (October 27, 2015, email from Mitchell indicating she had asked that Plaintiff only be paid for three hours for the week of his suspension).) The court must view all reasonable inferences in the light most favorable to Plaintiff. *See Matsushita Elec.*, 475 U.S. at 587. CVS concedes in its reply that "there was a brief two-week delay in Garren's receipt of the pay," but argues that because "Mitchell was already looking into the issue as of October 28" and because Plaintiff later received full pay, "the situation presented here is certainly not an adverse action as contemplated in the case law." (Doc. 85 at 14–15.) CVS does not, however, explain how this situation is distinguishable from adverse employment actions "contemplated in the case law." (*See id.*)

The "burden to establish a prima facie case is light, one 'easily met' and 'not onerous.'" *Willard*, 952 F.3d at 808 (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)). The purpose of the prima facie analysis is merely to eliminate the most common non-discriminatory reasons for an employer's treatment of the plaintiff, thereby raising a rebuttable presumption of discrimination. *Id.* (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000)). Plaintiff's showing of a delay in his pay during his suspension is sufficient to show an adverse employment action at the prima facie stage. CVS's argument that it is entitled to judgment as a matter of law on the grounds that Plaintiff's suspension was not an adverse employment action for purposes of Plaintiff's prima facie case therefore fails.

Defendants' next argument is under the fourth element of Plaintiff's prima facie case: that Plaintiff has made no showing of similarly situated individuals being treated more favorably than Plaintiff with respect to the conduct that led to his suspension and Level III warning. (Doc. 81 at 15.)

21

Plaintiff does not respond to this specific argument.  However, as the Court has explained above, the fourth element of Plaintiff's case is not limited to whether similarly situated individuals were treated more favorably than Plaintiff.  (*See supra* § III(C)(1).)  Rather, it requires a showing of "circumstances that support an inference of discrimination," which may include, but do not require, evidence of more favorable treatment of a similarly situated, non-protected employee. *Willard*, 952 F.3d at 808.  Plaintiff's response argues at some length that he has presented evidence from which a juror could conclude the suspension and Level III warning were a pretext for age discrimination.  (Doc. 84 at 19–22.)  Plaintiff's arguments and evidence on pretext, which the Court discusses specifically below, are enough to first meet the light burden of showing circumstances that support an inference of discrimination as to the suspension and Level III warning for purposes of establishing his prima facie case. *See Willard*, 952 F.3d at 808 (plaintiff's burden to establish prima facie case is light and easily met).

CVS argues next that it had a legitimate, non-discriminatory reason for the suspension and warning as to which Plaintiff cannot demonstrate pretext.  CVS points to Hatfield's morale survey, which "established that Garren had engaged in significant personal business during work hours; acted in an insulting manner towards leadership and staff; and showed pharmacy and front store staff inappropriate pictures."  (Doc. 81 at 15.)  CVS also relies on the argument that Plaintiff did not make phone calls he was supposed to make as a pharmacist.  (*Id.*)

Plaintiff responds that he has presented evidence from which a juror could conclude the suspension and Level III warning were a pretext for age discrimination.  (Doc. 84 at 19–22.)  He begins by arguing Plemons's complaint itself was manufactured, in that Plemons had not complained about Plaintiff in the ten previous years they had worked together, and she had only worked at Tellico one day since Plaintiff's return.  Next, he argues that Hatfield, Broyles, and

22

Mitchell used Plemons's complaint as an excuse to develop reasons to get rid of Plaintiff, going beyond the scope of the non-pharmacy-related complaint to explore his conduct as a pharmacist, without speaking with Wooldridge as Plaintiff's supervisor. Hatfield's emails at the time included statements Plaintiff characterizes as age-biased, such as Plaintiff's alleged inability to adapt or change to meet CVS's requirements. In addition, Plaintiff contrasts the scantiness of Hatfield's investigation of Plaintiff's multiple complaints of age discrimination with the effort Hatfield put into developing a written record against Plaintiff. Finally, Plaintiff argues that the Level III warning was an attempt to create a reason to fire Plaintiff: it required Plaintiff to make prescriber phone calls Plaintiff had objected to on ethical grounds, and it included the logistically impossible requirement that Plaintiff meet regularly with Wooldridge, even though they were the only two pharmacists at Tellico and could not both be away from filling prescriptions at the same time.

Plaintiff has borne his burden of showing Plemons's complaint and the survey results were insufficient to or did not actually motivate Plaintiff's suspension and warning. *See Lefevers*, 667 F.3d at 725. The Court considers the lack of any previous complaints about Plaintiff; the short time between Plaintiff's return to the store and Plemons's complaint against him; that Plemons's complaint was based only on second-hand information; the difference between Hatfield's investigation of Plaintiff's age-discrimination complaints and his investigation of Plemons's complaint; the completion of a morale survey of only three employees; Hatfield's failure to communicate with Wooldridge as Plaintiff's supervisor and the pharmacy manager about matters relating to pharmacy operations; Hatfield's failure to respond to Plemons regarding her complaint; and CVS's skipping over earlier stages of its progressive discipline policy against a long-term employee.[9] The context in which these events took place is also relevant. Within the months

---

[9] The Court also notes that CVS's characterization of Plaintiff's suspension as a

leading up to this disciplinary action, Plaintiff had been moved to a floater position to make room for a much younger replacement, and he had then been moved back to his original position, displacing the younger replacement and disrupting CVS's plans for the store.

In its reply, CVS argues Plaintiff "fails to even contend that he did not engage in the behavior attributed to him in the morale survey." (Doc. 85 at 14.) Showing an employer's professed reason for its actions "had no basis in fact" is only one of three ways in which a plaintiff may prove pretext. *Lefevers*, 667 F.3d 725. Showing the professed reason "did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct" are also permissible ways to show pretext, *see id.*, as Plaintiff has done here. Plaintiff therefore does not have to show he did not engage in the conduct attributed to him in the morale survey.

Because Plaintiff has established a prima facie case of ADEA discrimination as to Plaintiff's suspension and warning, and because Plaintiff has adequately met his burden of showing CVS's explanation for the suspension and warning was a pretext for discrimination, the Court will **DENY** CVS's motion for summary judgment on this claim.

### 4. Termination

Plaintiff claims his termination constituted age discrimination under the ADEA. CVS's motion for summary judgment attacks this claim on two grounds.

First, CVS argues Plaintiff has failed to satisfy the fourth element of his prima facie case because he has not shown CVS treated him differently than other employees, in that it fired other

---

"suspension pending investigation" seems inapt. CVS investigated for almost a month between Plemons's complaint and Plaintiff's suspension. It then suspended Plaintiff for approximately eight days, during which it does not identify any investigatory actions. (*See* Doc. 81 at 6–7.) Despite CVS's label for the suspension, there are circumstances from which a reasonable juror could conclude that it was meant as a punishment or a step toward termination.

24

employees CVS found to have falsified customer surveys. As discussed above, CVS's argument fails to recognize the breadth of the fourth element of the prima facie case. (*See supra* §§ III(C)(1), III(C)(3).) The fourth element requires a showing of "circumstances that support an inference of discrimination," which may include "when the employer replaced the plaintiff with a younger employee." *Willard*, 952 F.3d at 808.

Plaintiff has presented evidence that after CVS terminated him, it replaced him with floaters and with two new pharmacy graduates in turn. (Doc. 84 at 15, 23; Doc. 83-11 at 4–5 [Wooldridge Dep. at 23–27].) The first permanent replacement stayed about six months. (*See id.*) Plaintiff has not provided evidence about her age, but it is reasonable to infer from the fact that she was a new pharmacy graduate that she was substantially younger than Plaintiff. *See Matsushita Elec.*, 475 U.S. at 587 (court should view all reasonable inferences in the light most favorable to the nonmoving party). The current incumbent in the position is twenty-seven years old. (Doc. 84 at 15, 23; Doc. 83-11 at 4–5 [Wooldridge Dep. at 23–27].) CVS does not dispute that it replaced Plaintiff with substantially younger individuals after his termination. *See* Doc. 85 [Defs.' Reply Br.].) The Court concludes Plaintiff's evidence is sufficient to satisfy the fourth element of his prima facie case. *See Willard*, 952 F.3d at 808 (burden to establish prima facie case is light; purpose is to eliminate common non-discriminatory reasons for action).

CVS argues in the alternative that it had a legitimate, non-discriminatory reason for terminating Plaintiff: Plaintiff admitted to fraudulently completing customer surveys. (Doc. 81 at 15–16.) CVS further argues Plaintiff cannot demonstrate pretext, because CVS investigated and terminated other employees for doing the same thing. (*Id.*)

Plaintiff responds that "[e]veryone at Tellico made the same calls Plaintiff made at the direction of the Store and District Managers," and those people were not fired. (Doc. 84 at 13,

22.)  In addition, Plaintiff offers evidence that at the meeting to discuss his completion of the two surveys, he told Broyles and Burd that he made the calls in view of the security cameras on purpose to trigger the investigation, and that he said Broyles had encouraged front-store employees to complete surveys fraudulently.  (Doc. 84 at 14.)  Burd testified that he had no memory of a complaint against Broyles and did not investigate such a complaint.  There is accordingly a genuine issue of fact as to whether there were other, younger, employees who were not fired for engaging in the same conduct as Plaintiff, making CVS's reliance on the surveys a possible pretext for discrimination.

Because Plaintiff has established a prima facie case of ADEA discrimination as to Plaintiff's termination, and because Plaintiff has adequately met his burden of showing CVS's explanation for the termination was a pretext for discrimination, the Court will **DENY** CVS's motion for summary judgment on this claim.

### D.     ADEA Harassment

CVS argues Plaintiff has not pointed to evidence sufficient to establish that he was subjected to an actionable hostile work environment based on his age.  (Doc. 81 at 16.)  Plaintiff does not respond to this argument.  (*See* Doc. 84.)  A plaintiff who fails to address a claim in response to a motion for summary judgment is deemed to have abandoned that claim. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 371–72 (6th Cir. 2013). The Court accordingly will not address the merits of the motion for summary judgment on Plaintiff's ADEA harassment claim. *See Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (district court correctly declined to consider merits of claim plaintiff did not address in response to summary judgment motion).  The Court will **GRANT** CVS's motion for summary judgment as to Plaintiff's ADEA harassment claim.

26

### E.     ADEA Retaliation

The *McDonnell Douglas* burden-shifting framework described above as to discrimination (*see supra* § III(C)) also applies to Defendant's motion for summary judgment on Plaintiff's retaliation claims. *See, e.g.*, *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 544 (6th Cir. 2008).

To establish a prima facie case of retaliation under the ADEA and satisfy the first step of the burden-shifting framework for summary judgment purposes, a plaintiff must show: (1) the plaintiff engaged in protected activity; (2) the employer was aware of the protected activity; (3) the employer took an adverse employment action against the plaintiff; and (4) a causal connection between the protected activity and the adverse employment action. *Fox v. Eagle Distr. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (citing *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002)).

Plaintiff claims CVS retaliated against him for his age-related complaints by suspending him and putting him on a warning, and then by terminating him. CVS concedes Plaintiff engaged in protected activity under the ADEA. (Doc. 81 at 17.) CVS argues Plaintiff's prima facie case of retaliation fails as to the suspension and warning for lack of an adverse employment action, however, and as to both claims for lack of a causal connection between Plaintiff's protected activity and those actions.

### 1.     Suspension and Warning

Plaintiff claims his suspension and Level III warning violated the ADEA as acts of retaliation against him for complaining about age discrimination.

CVS first attacks Plaintiff's prima facie case of ADEA retaliation as to the suspension and warning on the grounds that they were not adverse employment actions. (Doc. 81 at 17.) CVS relies on the same reasons it advanced as to Plaintiff's discrimination claim. (*Id.*) The Court rejects those arguments here for the same reasons it rejected them above. (*See supra* § III(C)(3).)

27

Plaintiff has made a sufficient showing of an adverse employment action to satisfy his prima facie case of retaliation as to the suspension and warning.

CVS next argues Plaintiff's prima facie case of retaliation fails as to the suspension and warning under the fourth element, a causal connection between the actions and Plaintiff's protected activity. (Doc. 81 at 17.) CVS argues Plaintiff only has evidence of temporal proximity to establish a causal connection, and mere temporal proximity is legally insufficient. (*Id.* (quoting *Killen v. Walgreen Co.*, No. 2:17-cv-145, 2019 WL 3064593, at *17 (E.D. Tenn. July 11, 2019)).) Plaintiff responds that temporal proximity can be enough to establish causation where the lapse in time is short, and argues Plaintiff's is such a case. (Doc. 84 at 23–24 (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283–84 (6th Cir. 2012)).) Plaintiff also points to evidence that Hatfield was trying to build a case against Plaintiff as additional evidence of causation. (*Id.* at 24; *see also id.* at 7–10.)

CVS's focus on a bright-line rule against using temporal proximity to show causation is misplaced. CVS's motion accurately cites a recent district-court opinion which said there was such a rule, but which found pretext based on the combination of temporal proximity and other evidence. *See Killen*, 2019 WL 3064593, at *17. But CVS overlooks more thorough and nuanced discussions of the question in other opinions, including by the Court of Appeals itself. For example, CVS overlooks a seminal discussion of the question in one of the cases CVS itself cites elsewhere, in which the Court of Appeals analyzed the two lines of case law on temporal proximity and causation, concluding as follows:

> Although we acknowledge . . . some "confusion in the case law [exists] on this issue," . . . the two lines of cases are fully reconcilable. Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer

28

learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey*, 516 F.3d at 525 (second alteration in original; internal citation omitted).

While a bright-line rule about what amount of time is or is not sufficient to show causation would be convenient to apply, the Court and the parties are required to perform a more complex analysis based on the circumstances as a whole. In order to show a causal connection between protected activity and an adverse employment action, "a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (under Title VII). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Mickey*, 516 F.3d at 523 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). As set out in *Mickey*, 516 F3d at 525, temporal proximity is one of the factors the Court may consider, and temporal proximity may be sufficient alone when it is very close.

Plaintiff complained to CVS of age discrimination on August 5, 2015. Hatfield began an investigation against Plaintiff on or soon after September 22, 2015, when Plemons emailed her own complaint about Plaintiff to Broyles and Mitchell. Hatfield's investigation went into Plaintiff's performance as a pharmacist without seeking information from Wooldridge as pharmacy manager. The investigation also included Hatfield's request for detailed reports showing a drop in pharmacy performance since Plaintiff's recent September 13, 2015, return. Plaintiff was suspended on October 19, 2015, about two and a half months after his initial complaint of age discrimination. He was given a Level III warning on October 27, less than three months after his complaint. The Court finds the temporal proximity between Plaintiff's protected activity and his suspension and warning, combined with the circumstances of the aggressive

29

investigation into Plaintiff's performance, sufficient to satisfy the low bar of raising an inference that Plaintiff's protected activity was the likely reason for the suspension for purposes of Plaintiff's prima facie case. *See, e.g.*, *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435–36 (6th Cir. 2009) (temporal proximity of three months combined with management's heightened scrutiny of plaintiff's behavior during that time sufficient to establish causal nexus).

Because Plaintiff has established a prima facie case of ADEA retaliation as to his suspension and warning, the Court will **DENY** CVS's motion for summary judgment on this claim.[10]

### 2.     Termination

Plaintiff claims his termination violated the ADEA as an act of retaliation against him for complaining to CVS about age discrimination.

CVS argues there is no causal connection between Plaintiff's age complaints and his termination, and there is no pretext as to CVS's reason for the termination, because the termination was based on an independent event: Plaintiff's admitted completion of two customer surveys. (Doc. 81 at 17–18.) Plaintiff responds that the close proximity in time between his complaints and his termination allows an inference of retaliation. (Doc. 84 at 24–25.) Plaintiff further submits Hatfield knew about all of Plaintiff's protected activity and was involved in his termination. (*Id.* at 25.) As to pretext, Plaintiff refers to his earlier arguments that CVS's alleged reasons for its adverse actions against Plaintiff do not make sense. (*Id.*)

CVS offers no authority for its proposition that an intervening event defeats the causation element of a prima facie case of retaliation. Such an argument is more appropriately considered

---

[10] Defendant does not argue in its motion or reply that it should be granted summary judgment on this portion of Plaintiff's retaliation claim on the basis of a legitimate, non-discriminatory reason for the suspension and warning

30

at the pretext stage of the burden-shifting analysis. *See, e.g.*, *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 396 (6th Cir. 2017) (where defendant's grounds for contesting causation element was the existence of a non-discriminatory reason for termination, court assumed plaintiff established prima facie case and proceeded to consider pretext).

To show a causal connection between his age-discrimination complaints and his termination, Plaintiff "must proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *See Michael*, 496 F.3d at 596. Plaintiff complained to CVS of age discrimination on August 5, October 20, October 28, November 5, and November 6, 2015. He was terminated on November 6, 2015, a few hours after his last complaint. The temporal proximity between Plaintiff's final two complaints and his termination is very close. In addition, in Hatfield's October 21, 2015, email to Smith, Hatfield suggested terminating Plaintiff after complaining of Plaintiff's "mul[]tiple emails with claims we've been unable to substantiate at this time." (Doc. 83-2 at 139–143 [Pl.'s Ex. 1 at Bates No. 1006–10]; *id.* at 39 [Hatfield Dep. 246–47].) One of those "multiple complaints" of which Hatfield was critical was Plaintiff's complaint of age discrimination on October 20, 2020. Mindful that Plaintiff's burden to establish his prima facie case is light and easily met, *see Willard*, 952 F.3d at 808, the Court finds Plaintiff has proffered evidence sufficient to raise the inference that his age discrimination complaints were the likely reason for his termination.

CVS points to Plaintiff's completion of the surveys as its legitimate, nondiscriminatory reason for terminating Plaintiff. (Doc. 81 at 17–18.) Plaintiff argues this is a pretext, in that "CVS's reasons for its actions make no sense, and a reasonable juror could certainly conclude that the real reasons were retaliatory for age-based protected activity." (Doc. 84 at 25.)

Pretext can be proven by showing the reason the employer gave for its actions "had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct." *Lefevers*, 667 F.3d at 725. CVS's allegation that Plaintiff completed customer surveys has a basis in fact, as Plaintiff has admitted. Nor does Plaintiff argue this conduct was insufficient to motivate his termination; on the contrary, other employees were terminated for the same type of conduct.[11] That leaves the question of whether Plaintiff has shown his completion of the surveys did not actually motivate his termination.

Throughout the burden-shifting analysis, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143. As the movant in the motion for summary judgment, however, CVS bears the burden of showing there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), viewing the evidence and all reasonable inferences in the light most favorable to Plaintiff, *Matsushita*, 475 U.S. at 587.

Viewed through these lenses, the Court sees the following. CVS asked Plaintiff, who was over sixty years old, about his retirement plans. Plaintiff said he did not plan to retire in the foreseeable future. CVS then hired a young pharmacy graduate to fill a non-existent vacancy at the Tellico pharmacy anyway, telling Plaintiff he would have to become a floater pharmacist because the new hire could not be one. After Plaintiff complained of age discrimination and asked to be moved back to Tellico, CVS complied. However, within a week of Plaintiff's return, Hatfield took the opportunity of Plemons's second-hand complaint about Plaintiff's attitude and comments to investigate Plaintiff, including his performance as a pharmacist, without speaking with

---

[11] Plaintiff has not presented the Court with evidence of the frequency of the other employees' conduct as compared to the two occasions to which Plaintiff has admitted.

32

Plaintiff's supervisor. CVS suspended Plaintiff for a week, initially without pay. Plaintiff complained again about age discrimination, and Hatfield suggested terminating Plaintiff in an email with a negative tone about Plaintiff's complaints. Instead of terminating Plaintiff, however, CVS gave him a Level III warning and performance plan, the first discipline of his career, explicitly warning him of a possible termination. Again, Plaintiff complained of discrimination.

Within days of arriving at this fraught moment, CVS learned that Plaintiff had completed two surveys from customer receipts. Plaintiff complained of age discrimination before and during his final meeting with CVS personnel. During the meeting, Plaintiff explained he disagreed with the practice of completing customer surveys, but said he did it deliberately to get attention and trigger an investigation. CVS fired him the same day.

Was Plaintiff's explanation for his conduct with the surveys truthful? If so, was his conduct excusable? And, ultimately, were the surveys CVS's true reason for the termination, or was Plaintiff's conduct a convenient opportunity to do what CVS had been wanting to do for some time? Based on the factual showing made by Plaintiff described above as to the possibility of pretext,[12] and considering the burden on CVS to show it is entitled to judgment as a matter of law in order to prevail on its motion for summary judgment, the Court cannot conclude CVS is entitled to judgment as a matter of law as to pretext. These questions must be answered instead by the trier of fact. The Court will **DENY** CVS's motion for summary judgment on Plaintiff's retaliation claim.

---

[12] CVS does not even acknowledge the existence of Plaintiff's explanation for his conduct in either of its briefs on summary judgment. According to Plaintiff, he offered that explanation not just in this litigation, but in the meeting immediately before his termination. CVS's continued failure to acknowledge Plaintiff's explanation—even for the purpose of dismissing it—adds weight to Plaintiff's showing that his completion of the surveys was not actually the motivation for his termination.

33

### F.    ADA Claims

For the ADA to apply, a person must have a "disability" as defined in the Act, meaning he or she either (1) has "a physical or mental impairment that substantially limits one or more major life activities," (2) has "a record of such an impairment," or (3) is "regarded as having such an impairment."  42 U.S.C. § 12102(1); *see also Booth v. No. Am., Inc.*, 927 F.3d 387, 393 (6th Cir. 2019).  Courts are to apply a broad construction in favor of expansive coverage in determining whether a person is disabled and whether an impairment "substantially limits" a major life activity. *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 299 (6th Cir. 2019) (citing 42 U.S.C. § 12102(4)(A), (B).)

CVS argues at some length that there is no evidence Plaintiff has a disability under any of the three definitions set out in the ADA.  (Doc. 81 at 18–20.)  Plaintiff asserts in response that he "has chronic venous insufficiency, which limits the amount of time Plaintiff can work on his feet." (Doc. 84 at 25.)  Plaintiff therefore appears to rely on the first part of the ADA's definition to establish his disability: "a physical . . . impairment that substantially limits one or more major life activities."  *See* 42 U.S.C. § 12102(1)(A).  "Standing" and "working" both qualify as major life activities.  *See id.* § 12102(2)(A).

"To determine whether a disability substantially limits major life activities, the regulations direct courts to compare the person claiming a disability to 'most people in the general population.'"  *Morrissey*, 946 F.3d at 299 (quoting *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853–54 (6th Cir. 2018)).  This is not a demanding standard, and it generally does not require a plaintiff to submit scientific, medical, or statistical evidence.  *Id.* (citing 29 C.F.R. § 1630 (App'x), *id.* § 1630.2(j)(v)).

CVS's motion asserts "[t]here is no evidence that Garren's condition substantially limited any major life activity during his employment with CVS."  (Doc. 81 at 18.)  In response, Plaintiff

offers his own deposition testimony that his medically diagnosed chronic venous insufficiency limits his ability to stand and his ability to work while standing, and that he had swelling in his lower legs that made it difficult to get his pants over his leg. (*See* Doc. 84 at 2–3 (citing Doc. 83-1 at 3–4 [Garren Dep. at 23, 26, 28]).) But that is all. Plaintiff offers no information as to how long he could comfortably stand, what happened if he stood too long, how often his work required him to stand, or any other facts the Court could use to compare him to "most people in the general population." *See Morrissey*, 946 F.3d at 299. The Court therefore lacks evidence from which it could find Plaintiff is substantially limited in standing or working. Without such evidence, the Court cannot determine that Plaintiff qualifies as a person with a disability under the ADA.

Moreover, Plaintiff's single paragraph of argument as to all of his ADA claims together does not explain or apply the definition of a disability or any of the relevant standards. "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (alteration in original; citation omitted).

The Court thus lacks both evidence from which to determine that Plaintiff has a disability and argument by Plaintiff explaining how he satisfies even the lenient standard of having a disability under the ADA. The Court will therefore **GRANT** CVS's motion for summary judgment as to Plaintiff's claims under the ADA.


## IV.    <u>CONCLUSION</u>

The Court will **GRANT IN PART AND DENY IN PART** Defendants' motion for summary judgment (Doc. 80). The Court will **GRANT** summary judgment in favor of CVS Pharmacy, Inc. and Tennessee CVS Pharmacy, LLC on all claims. The Court will **GRANT** CVS Rx Services, Inc.'s motion for summary judgment as to Plaintiff's ADEA harassment claim and

35

his ADA claims. The Court will **DENY** CVS Rx Services, Inc.'s motion for summary judgment on Plaintiff's claims of ADEA discrimination and ADEA retaliation. The Court will **OVERRULE** Plaintiff's objection (Doc. 88) **AS MOOT**.

       **An appropriate order will enter.**

/s/ _____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

36